**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**EASTERN DIVISION**

<table>
<tr><td>JOSE LUIS VIZCAINO-RAMOS,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>      Petitioner,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td>Case No. 1:14-cv-01230-STA-egb</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>CHERRY LINDAMOOD,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>      Respondent.</td><td>)</td><td></td></tr>
</table>

ORDER DENYING § 2254 PETITION,
DENYING CERTIFICATE OF APPEALABILITY,
AND
DENYING LEAVE TO APPEAL *IN FORMA PAUPERIS*

On September 11, 2014, Petitioner, Jose Luis Vizcaino-Ramos, filed a *pro se* habeas

corpus petition under 28 U.S.C. § 2254 ("Petition"). (ECF No. 1.) For the reasons that follow,

the Petition is **DENIED**.

## BACKGROUND

The following background summary is drawn from the state court record (ECF No. 20),

and the decisions in Vizcaino-Ramos's state appeals. *See State v. Vizcaino-Ramos*, No. W2010-

01325-CCA-R3-CD, 2011 WL 3330294, at *1 (Tenn. Crim. App. August 3, 2011), *perm. app.*

*denied* (Tenn. Nov. 16, 2011); *Vizcaino-Ramos v. State*, No. W2012-02319-CCA-R3-CD, 2013

WL 6212041, at *1 (Tenn. Crim. App. Nov. 20, 2013), *perm. app. denied* (Tenn. Apr. 9, 2014).

**1. Trial and Direct Appeal**

In early 2010, Vizcaino-Ramos was tried before a Hardeman County jury for the first

degree premediated murder of his ex-girlfriend, Mary Graves. *Vizcaino-Ramos*, 2011 WL

3330294, at *1.  The victim's son, who was eleven years old at the time of trial, testified that in March 2004, when he was five years old, he was sitting in the back seat of his mother's car, which was parked in front of their house.  His mother and the defendant were in the front seat arguing.  He testified that the defendant shot his mother, "dragged [her] body out of the car and placed it by her house."  *Id.*  The defendant then took the child into his mother's house and left him alone for the night.  *Id.*

A passerby testified that he encountered the child that same night "standing in the middle of the highway."  *Id.*  The child told him that his "dad" had killed his mom.  The man "flagged down a police officer and explained the situation."  *Id.*

Several law enforcement officers testified to various aspects of the investigation.  Their testimonies revealed that the victim's body, which "had multiple gunshot wounds," was found "by the side" of her house"; "a nine millimeter handgun, spent shell casings, and rounds of ammunition were found at the scene"; and the victim's car was later found in Texas and contained "a spent shell casing that was fired from a handgun" which "had the marking of a nine millimeter Luger."  *Id.* at *1-2.  It was determined that the casing found at the crime scene and the slugs found inside the victim's body "were fired from the gun found at the crime scene."  *Id.* at *2.

An officer also testified that she had interviewed the child after the shooting, and that his "description during the interview was consistent with his testimony at trial."  *Id.*  She stated that the defendant was found in Mexico in late 2008 and extradited to Tennessee.  *Id.*  After his extradition, he "admitted to [an] [o]fficer that he shot the victim," but "claimed that he [did so] accidentally . . . while they were fighting over a gun."  *Id.*  The defendant "did not explain why the gun was fired six times."  *Id.*

Reba Thurmon and Alberto Vasquez, close friends of Vizcaino-Ramos, testified what transpired before the shooting. Vasquez stated that the defendant had been "upset that his relationship with the victim had ended and had expressed a desire to commit suicide." *Id.* He also stated that he had "never heard" his friend "talk" about harming another person." *Id.* Thurmon testified that, shortly before the victim was killed, the defendant visited the house she shared with Vasquez. *Id.* Vizcaino-Ramos was driven to the house by the victim, and Thurmon could see that the child was riding in the backseat of the car. *Id.* "During the visit, Vasquez agreed to pick up the [d]efendant . . . from the victim's house later that evening." *Id.* However, "[w]hen Thurmon and Vasquez drove to the victim's house to pick up Vizcaino-Ramos, no one was there." *Id.*

Two witnesses testified to conversations they had with the defendant a couple of months before the shooting. Both stated that Vizcaino-Ramos threatened to kill his girlfriend. *Id.*

Vizcaino-Ramos was convicted of first degree murder and sentenced him to life in prison. *Id.* at *1.

On direct appeal, Petitioner challenged the trial court's admission of the child's testimony and the sufficiency of the evidence to convict him of first degree murder. *Id.* The Tennessee Court of Criminal Appeals ("TCCA") affirmed the conviction. *Id.* The Tennessee Supreme Court subsequently denied Petitioner's application for permission to appeal. (ECF No. 20-8 at 1.)

## 2. Post-conviction Proceedings

Vizcaino-Ramos filed a *pro se* post-conviction petition in the state court (ECF No. 20-9 at 6-40), which was later amended through appointed counsel (*id.* at 48-50). The amended petition presented the following claims:

1. "That Trial Counsel was ineffective because [she] failed to explore a mental defense that would assist the trier of fact in applying a 'heat of passion,' temporary insanity, post-traumatic stress disorder or other disease or defect leading to a potential manslaughter conviction or other lesser included verdict. No Motion for a Mental Evaluation was filed in Petitioner's case." (*Id.* at 48.)

2. Although "[s]everal jailers made reports of Defendant's hallucinations i.e., hearing voices in his head and crying[,] . . . . no efforts were made to request a formal mental evaluation to determine Petitioner's ability to stand trial or of his competence/illness at the time of the incident." (*Id.*)

3. "That Trial Counsel failed to reasonably investigate the circumstances surrounding the victim violating the Hardeman County General Sessions Court's No Contact Order by going to Petitioner's home on the day of the incident . . . . If the victim initiated contact with Petitioner in violation of a No Contact Order, it could assist the trier of fact [to] understand the manipulation of Petitioner's emotions and such might lead to a manslaughter conviction or other lesser included verdict." (*Id.* at 49.)

4. "That Trial Counsel failed to investigate the existence of witnesses and procure information from potential witnesses who could have furthered a theory of manslaughter[,] . . . includ[ing] but not limited to . . . Juan Martinez [and] . . . Anthony Parnell." (*Id.*)

5. "That Trial Counsel failed to . . . request compensation [to retain] . . . a Firearms or Ballistic Expert [or] . . . any Mental Health Professional[]." (*Id.*)

6. "That Trial Counsel's performance was deficient, ineffective and prejudicial throughout this representation of Petitioner." (*Id.*)

According to the post-conviction court, Petitioner's "major point of contention . . . [was] that [trial counsel] did not present evidence . . . which would have bolstered his claim of heat of passion and manslaughter." (ECF No. 20-9 at 66-69.) The court held an evidentiary hearing at which Petitioner, trial counsel, Petitioner's brother, and two other individuals testified. (*Id.* at 66-68.)

Petitioner testified that on the day of the shooting he was distraught over the break-up with the victim and was thinking of killing himself. (ECF No. 20-10 at 115.) He stated that he then saw the victim drive up to his house, with her son in the backseat of the car, in violation of a

no-contact order that prohibited Vizcaino-Ramos from being in proximity to the victim. (*Id.* at 115, 120.) The no-contact order had been issued as a result of Petitioner shooting at the victim's car several weeks earlier. (ECF No. 1 at 45-46.)

Petitioner further testified that the victim was shot during a struggle which the victim instigated. (ECF No. 20-10 at 116-17.) He stated that, while traveling together in the car, the victim had "tried to push" him down, insisting several times that he "lay down" in the car so she would not "get . . . in trouble" with her then-boyfriend if he saw them together. (ECF No. 20-10 at 116.) He testified that she also cursed at him, told him that she never loved him, and "slapped [his] face a couple of times." (*Id.* at 116-17.) Petitioner stated that he then started to cry, and when he lifted his shirt to wipe his face, the victim saw the handgun in his waistband, reached for it, and stated "'I'm going to help you kill yourself right now.'" (*Id.* at 117.) The two struggled for control of the gun, and the victim was accidentally shot during the struggle. (*Id.* at 117, 124.)

Vizcaino-Ramos testified that he told his trial counsel about these events, and stated that if he had been allowed to present a different defense he would have testified about them at trial. (*Id.* at 121, 124.) When pressed, he had no explanation for how the victim could have been shot six times by accident. (*Id.* at 124-25.)

The court also heard testimony from trial counsel regarding her conduct in meeting with Petitioner, investigating the evidence, and assessing his mental state. (*Id.* at 30-93.) She testified that "in her experience, [P]etitioner was 'pretty competent.'" *Vizcaino-Ramos*, 2013 WL 6212041, at *3. She stated that she had been "unaware of a statement [P]etitioner made to a jailer wherein he reported hearing voices," and that he "never said anything to her about temporary insanity, post-traumatic stress disorder, or mental disease or defect." *Id.* at *3, 4. She further "said that she tried to argue at trial that he was not thinking rationally when he shot the

victim, [and] that 'he was distraught[,] [b]ut [that] it was not to the point that he was incompetent or insane.'" *Id.* at *3 (alterations in original).

With regard to the no-contact order, counsel explained that she made a strategic decision not to introduce this evidence. (ECF No. 20-10 at 45-47.) She believed that if the jury knew that a no-contact order existed, the door would be opened for the jury to hear that the order was issued because Petitioner fired shots into the victim's automobile. (*Id.* at 45-46.)

Counsel also testified that her client never told her the version of events he presented at the post-conviction hearing. (*Id.* at 130.) She further stated that if he had told her, she would not have changed her strategy of trying to negate the element of premeditation in light of the overwhelming evidence:

> If there had been one gunshot wound, okay, we were arguing the gun when off, I got scared and left, but when you have multiple gunshot wounds, you put the kid out of the car, you take the body out of the car, you flee to Mexico, live in Mexico for four years, start up a new family, have a baby with your new friend in Mexico, I just—I don't—and he continually blamed Mary for being killed. It was her fault she got herself killed.

(*Id.* at 131.)

The three individuals whom Petitioner claimed trial counsel should have interviewed and called as witnesses testified at the post-conviction hearing. Petitioner's brother described Petitioner as having been "'out of his mind crazy'" over rumors that the victim had been seeing another man, but "did not believe that [P]etitioner needed 'mental help.'" *Vizcaino-Ramos*, 2013 WL 6212041, at *4. Kimberly Pannell testified that she had a single encounter with Petitioner, in which he stated that he "'might get Mikey,'" one of the men the victim was rumored to have been seeing. *Id.* at * 3. She described Petitioner as having been "'very calm and collected'" at the time of their conversation. *Id.* Anthony Parnell testified that he "'went out a few times' with the victim." *Id.* He stated that after he found out that the victim had been killed, he heard a

rumor that Petitioner "'was coming after'" him, but that "he never had any contact with [P]etitioner." *Id.*

The post-conviction court considered the evidence presented and "accredit[ed] the testimony of each witness other than Petitioner Ramos." (ECF No. 20-9 at 69.) The court denied all claims, concluding that "defense counsel presented a reasonable defense for the petitioner." (*Id.*)

In his appeal from the denial of his post-conviction claims, Vizcaino-Ramos raised only the narrow issues of whether trial counsel was ineffective in failing to investigate and call the Parnells and the defendant's brother as witnesses, and failing to seek a mental evaluation. (ECF 20-11 at 12.)[1] The TCCA affirmed the lower court's determination that trial counsel had not been ineffective. *Vizcaino-Ramos*, 2013 WL 6212041, at *7. The Tennessee Supreme Court denied Petitioner's application for permission to appeal. (ECF No. 20-15 at 1.)

### 3. Federal Habeas Petition

Petitioner filed his federal habeas Petition in 2014, asserting the following claims:

**Claim 1:** Post-conviction counsel was ineffective for failing to present the claim that trial counsel was ineffective in failing "to obtain and present forensic analysis of the wou[n]d pattern and crime scene evidence which would have yielded exculpatory evidence showing Petitioner's [i]nnocence." (ECF No. 1 at 10.)

**Claim 2** : Trial counsel was ineffective in failing "to obtain and present forensic analysis of the wou[n]d pattern and crime scene evidence which would have yielded exculpatory evidence showing Petitioner's [i]nnocence." (*Id.*)

**Claim 3:** Post-conviction counsel was ineffective for failing to present the claim that trial counsel was ineffective for failing "to properly request forensic examination[]s of the victim's hands, personal effects, and clothing in order to

---

[1] Petitioner also asserted on appeal that trial counsel did not thoroughly review discovery. (ECF No. 20-11 at 16.) The TCCA found that Petitioner waived the issue by arguing it for the first time on appeal. *Vizcaino-Ramos*, 2013 WL 6212041, at *6 n.1.

check for physical evidence which supported Petitioner's testimony that the shooting was unintentional as opposed to premeditated murder." (*Id.*)

**Claim 4**: Trial counsel failed "to properly request forensic examination[]s of the victim's hands, personal effects, and clothing in order to check for physical evidence which supported Petitioner's testimony that the shooting was unintentional as opposed to premeditated murder." (*Id.*)

**Claim 5:** Post-conviction counsel was ineffective for failing to present the claim that trial counsel was ineffective for failing "to properly request forensic examination [of] the .9 mm pistol used in the shooting, in order to check for physical evidence which supported Petitioner's testimony that the shooting was unintentional as opposed to premeditated murder." (*Id.* at 11.)

**Claim 6**: Trial counsel failed "to properly request forensic examination [of] the .9 mm pistol used in the shooting, in order to check for physical evidence which supported Petitioner's testimony that the shooting was unintentional as opposed to premeditated murder." (*Id.*)

**Claim 7:** Post-conviction counsel was ineffective for failing to present the claim that trial counsel was ineffective by failing "to properly present to the jurors the facts and circumstances surrounding the murder of the victim, in order to show that it was an unintentional as opposed to premeditated murder." (*Id.*)

**Claim 8**: Trial counsel failed "to properly present to the jurors the facts and circumstances surrounding the murder of the victim, in order to show that it was an unintentional as opposed to premeditated murder," specifically:

> 8(a) failing to present to the jury evidence that the victim initiated contact with Vizcaino-Ramos in violation of a "no-contact" order; and

> 8(b) failing to present other evidence of lack of premeditation (*id.* at 11, 22-25).

**Claim 9:** Post-conviction counsel was ineffective for failing to present the claim that trial counsel was ineffective for failing "to properly request instructions on, and present evidence to support the defenses of: (a) diminished capacity, (b) voluntary intoxication, (c) duress, and (d) accident and misfortune; and thereby prove that the murder of Mary Graves was unintentional as opposed to premeditated." (*Id.* at 11.)

**Claim 10**: Trial counsel failed "to properly request instructions on, and present evidence to support the defenses of":

**10(a)** diminished capacity,

**10(b)** voluntary intoxication,

**10(c)** duress, and

**10(d)** accident and misfortune,

"and thereby prove that the murder of Mary Graves was unintentional as opposed to premeditated." (*Id.*)

**Claim 11:** Post-conviction counsel was ineffective for failing to present the claim that trial counsel was ineffective for failing failed "to properly obtain and present to the jurors, testimony of a forensic psychiatrist or neuro-psychologist showing that under the circumstances and facts of the murder, Petitioner lacked the capacity [to] form the requisite mental state." (*Id.* at 12.)

**Claim 12**: Trial counsel failed "to properly obtain and present to the jurors, testimony of a forensic psychiatrist or neuro-psychologist showing that under the circumstances and facts of the murder, Petitioner lacked the capacity [to] form the requisite mental state." (*Id.*)

**Claim 13:** Post-conviction counsel was ineffective for failing to present the claim that trial counsel was ineffective for failing "to object to and challenge the admissib[ility] [of] evidence of prior bad acts, which therefore prejudiced the Petitioner." (*Id.*)

**Claim 14**: Trial counsel failed "to object to and challenge the admissib[ility] [of] evidence of prior bad acts, which therefore prejudiced the Petitioner." (*Id.*)

**Claim 15:** Post-conviction counsel was ineffective for failing to present the claim that trial counsel was ineffective for making "egregious and erroneous statements to the jury during both opening and closing arguments." (*Id.*)

**Claim 16**: Trial counsel "made egregious and erroneous statements to the jury during both opening and closing arguments," specifically:

**16(a)** failing to explain in her opening statement why the State could not prove the element of premeditation (*id.* at 68);

**16(b)** failing to argue at closing the defenses of voluntary intoxication and diminished capacity (*id.* at 69);

**16(c)** failing to argue at closing the defenses of adequate provocation and duress (*id.*); and

**16(d)** making an "inept and strategically senseless" statement during closing argument (*id.*).

On February 15, 2017, Respondent filed the state-court record and her Answer to the Petition. (ECF No. 20; ECF No. 21.) Vizcaino-Ramos filed a Reply (ECF No. 27), as well as motions for an evidentiary hearing and discovery (ECF No. 22; ECF No. 25). By order dated November 7, 2017, the Court denied the motions and allowed Petitioner leave to file a supplemental reply. (ECF No. 32.) The supplemental reply was timely filed on December 1, 2017. (ECF No. 33.)

## DISCUSSION

Respondent argues that most of Petitioner's claims are procedurally defaulted, while the single claim properly before the Court is without merit. (ECF No. 21 at 15.) Petitioner asserts that the ineffective assistance of post-conviction counsel should excuse all of the procedural defaults. (ECF No. 1 at 10-12; ECF No. 27 at 3-4.) The Court agrees with Respondent that the Petition must be denied in its entirety.

## 1. Legal Standards

### A. Habeas Review and Procedural Default

The statutory authority for federal courts to issue habeas corpus relief for persons in state custody is provided by § 2254, as amended by the Antiterrorisim and Effective Death Penalty Act ("AEDPA"). *See* 28 U.S.C. § 2254. Under the AEDPA, where the petitioner's claim was "adjudicated on the merits" in the state courts, 28 U.S.C. § 2254(d), federal habeas relief "may not be granted" unless the state-court decision is "contrary to" clearly established federal law, "involved an unreasonable application of such law," or "was based on an unreasonable determination of the facts in light of the record before the state court." *Harrington v. Richter*,

562 U.S. 86, 100 (2011) (internal quotation marks and citations omitted) (citing 28 U.S.C. § 2254(d)(1), (d)(2)). State-court factual findings are "only unreasonable where they are 'rebutted by clear and convincing evidence' and do not have support in the record." *Moritz v. Woods*, 692 F. App'x 249, 254 (6th Cir. 2017) (*quoting Pouncy v. Palmer*, 846 F.3d 144, 158 (6th Cir. 2017) (internal quotation marks omitted)).

Before a federal court will review the merits of a claim brought under § 2254, the petitioner must have "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). To be properly exhausted, a claim must be "fairly presented" through "one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

The exhaustion requirement works in tandem with the procedural-default rule, which generally bars federal habeas review of claims that were procedurally defaulted in the state courts. *Coleman v. Thompson*, 501 U.S. 722, 752-53 (1991); *Boerckel*, 526 U.S. at 848. A petitioner procedurally defaults his claim where he fails to properly exhaust available remedies (that is, fails to "fairly present" the claim through "one complete round" of the state's appellate review process), and he can no longer exhaust because a state procedural rule or set of rules have closed-off any "remaining state court avenue" for review of the claim on the merits. *Harris v. Booker*, 251 F. App'x 319, 322 (6th Cir. 2007). Procedural default also occurs where the state court "actually . . . relie[s] on [a state] procedural bar as an independent basis for its disposition of the case." *Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985). To cause a procedural default, the state court's ruling must "rest[] on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman*, 501 U.S. at 729.

It is only when the petitioner shows "cause for the default and actual prejudice as a result of the alleged violation of federal law," or demonstrates that "the court's failure to consider the claim[] will result in a fundamental miscarriage of justice," that a federal court will review the merits of a claim that was procedurally defaulted. *Id.* at 748, 750. The ineffectiveness of post-conviction counsel may be cause to excuse the default of an ineffective-assistance-of-trial-counsel claim. *Martinez v. Ryan*, 566 U.S. 1, 7 (2012); *Trevino v. Thaler*, --U.S.--, 133 S. Ct. 1911, 1918 (2013); *Hodges v. Colson*, 727 F.3d 517, 531 (6th Cir. 2013).

**B. Ineffective Assistance of Counsel**

A claim that the ineffective assistance of counsel has deprived a defendant of his Sixth Amendment right to counsel is controlled by the standards stated in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To succeed on this claim, a petitioner must demonstrate two elements: (1) that counsel's performance was deficient, and (2) "that the deficient performance prejudiced the defense." *Id.* "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686.

To establish deficient performance, a person challenging a conviction "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range of reasonable professional assistance." *Id.* at 689. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687.

To demonstrate prejudice, a petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*

at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' . . . Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' . . . ." *Richter*, 562 U.S. at 104 (citing *Strickland*, 466 U.S. at 687, 693).

The deference to be accorded a state-court decision under 28 U.S.C. § 2254(d) is magnified when a court reviews an ineffective assistance claim:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.*, at 689; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles* [*v. Mirzayance*], 556 U.S., at 123, 129 S. Ct. at 1420 [(2009)]. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123, 129 S. Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* at 105.

## 2. Odd-numbered Claims

In Claims 1, 3, 5, 7, 9, 11, 13, and 15, Petitioner alleges that post-conviction counsel was ineffective "for failing to present" the ineffective assistance of trial counsel claims that are contained in Claims 2, 4, 6, 8, 10, 12, 14, and 16, respectively. (ECF No. 1 at 10-12.)

As stand-alone claims, Claim 1, 3, 5, 7, 9, 13, and 15 are non-cognizable. *See* 28 U.S.C. § 2254(i) (the ineffective assistance of post-conviction counsel "shall not be a ground for relief in a proceeding arising under section 2254"); *see also Coleman*, 501 U.S. at 752 (there is no constitutional right to post-conviction counsel). Petitioner acknowledges as much, but argues

that the alleged errors of post-conviction counsel are "cause" to excuse the procedural defaults of some or all of his substantive claims. (ECF No. 27 at 3.)

Accordingly, the Court does not consider Claims 1, 3, 5, 7, 9, 11, 13, and 15 to be stand-alone claims, but regards them as allegations of "cause" to excuse Petitioner's procedural defaults.

### 3. Claims 2, 4, 6, 8, 10(c), 10(d), and 16(c)

Petitioner asserts that trial counsel failed "to properly present to the jurors the facts and circumstances surrounding the murder of the victim, in order to show that it was an unintentional as opposed to premeditated murder" (Claim 8). (ECF No. 1 at 11.) He alleges that the shooting was the result of the victim's provocation, and, thus constituted voluntary manslaughter.[2] (Id. at 25.) He also asserts that the shooting was an accident resulting from a struggle instigated by the victim when she "forcefully removed the gun from Petitioner's waist band." (Id.) That scenario, he argues, comprises involuntary manslaughter.[3] (Id.) Petitioner claims, too, that his version of the events show that he shot the victim in self-defense, defense of another, and while under duress.[4] (Id. at 37.) He insists that trial counsel should have pursued all of those defenses by

_____

[2] "In Tennessee, voluntary manslaughter is the 'intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.'" *Walls v. United States*, No. 17-5354, 2017 WL 47709223, at *2 (6th Cir. Aug. 24, 2017) (quoting Tenn. Code Ann. § 39-13-211(a)).

[3] Criminally negligent homicide, previously known as involuntary manslaughter, is defined as "[c]riminally negligent conduct that results in death." Tenn. Code Ann. § 39-13-212.

[4] Self-defense, defense of another, and duress are closely related. *State v. Hawkins*, 406 S.W.3d 121, 128 (Tenn. 2013); *State v. Bledsoe*, 226 S.W.3d 349, 356 (Tenn. 2007). A claim of self-defense is justified where the defendant "reasonably believe[d] th[at] force [was] immediately necessary to protect against the other's use or attempted use of unlawful force." Tenn. Code Ann. § 39–11–611(b) (2002). A person may "use deadly force 'to protect a third person' when he or she 'reasonably believes' that the third person would be justified in using

developing, presenting, and arguing certain evidence (Claims 2, 4, 6, 8(a), 8(b), 10(c), 10(d), and 16(c)). (*Id.*) He also contends that counsel should have sought jury instructions on the defenses of duress (Claim 10(c)) and accident (Claim 10(d)), and should have argued adequate provocation and duress in her closing argument (Claim 16(c)). [5] (*Id.* at 11-12.)

Respondent argues that the claims are procedurally defaulted, and that the defaults are unexcused. (ECF No. 21 at 15.) The Court agrees.

Vizcaino-Ramos first argues that his attorney was ineffective by failing to introduce the no-contact order to show that the victim instigated contact with the defendant in violation of the order, and therefore provoked him (Claim 8(a)). As noted, the primary issue litigated in the initial post-conviction proceeding was whether trial counsel was ineffective in failing to present a manslaughter defense. (ECF No. 20-9 at 66.) Petitioner challenged, among other things, trial counsel's failure to introduce evidence of provocation, including the no-contact order. (*Id.* at 49, 67; ECF No. 20-10 at 42-43, 120.) On appeal after denial of post-conviction relief, the defendant raised only the narrow issues of counsel's failure to call the Parnells and his brother to the stand, and her failure to seek a mental evaluation of Petitioner. *Vizcaino-Ramos*, 2013 WL 6212041, at *5. The time for raising the no-contact-order issue to the appellate court has passed. *See* Tenn. Code Ann. § 40-30-106(g) ("A ground for relief is waived if the petitioner . . . failed to present it

---

deadly force under Tenn.Code Ann. § 39–11–611 and that 'the intervention is immediately necessary to protect the third person." *Hawkins*, 406 S.W.3d at 128 (quoting Tenn Code Ann. § 39-11-612). Duress "is present when a defendant commits an offense because another person threatens death or serious bodily injury if the offense is not committed." *Bledsoe*, 226 S.W.3d at 356 (internal quotation marks omitted).

With regard to Petitioner's allegation that he was defending another, the Court assumes he means to say that he was defending the victim's son.

[5] The 74-page Petition presents claims and legal and factual arguments that overlap considerably. Accordingly, the Court groups the claims by their substantive content rather than by their assigned numbers.

for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented.") The claim is thus procedurally defaulted. *See Boerckel*, 526 U.S. at 845.[6]

Vizcaino-Ramos acknowledges that he defaulted the claim, but asserts that *Martinez* excuses the default. (ECF No. 1 at 11; ECF No. 33 at 1-7.) The default, however, occurred at the appellate level, and "postconviction appellate counsel's ineffective assistance cannot serve as cause to excuse a procedural default." *Young v, Westbrooks*, 702 F. App'x 255, 259 (6th Cir. 2017).

Petitioner also asserts that his trial counsel should have presented and argued certain forensic evidence which, he insists, was "consistent with" the victim "forcefully" grabbing the gun, thereby instigating a struggle that ended in an accidental shooting, or in a shooting committed under duress or in self-defense (or defense or another) (Claims 2, 4, 6, 8(b)). (ECF No. 1 at 26-28.) He argues, specifically, that counsel should have presented forensic evidence of the wound pattern and the crime scene (Claim 2); requested a forensic examination of the victim's hands, personal, effects, and clothing (Claim 4); and requested a forensic examination of the gun to show that the victim had "personally handled" it (Claim 6). (*Id.* at 10-11, 26-28, 50.) He also claims that trial counsel was ineffective by failing to present evidence of, and seek jury instructions on, the defenses of duress (Claim 10(c)) and accident (Claim 10(d)), and by failing to argue adequate provocation and duress at closing (Claim 16(c)). (*Id.* at 12, 69.)

---

[6] In his motion for an evidentiary hearing (ECF No. 22), and in his Reply (ECF No. 27), Petitioner insisted that he is entitled to an evidentiary hearing on the claim that his counsel should have introduced the no-contact order. The Court denied the motion, finding that a hearing would be futile because the claim was defaulted and, further, that 28 U.S.C. § 2254(e)(2) forbids an expansion of the state record. (ECF No. 32 at 8-9.)

Petitioner did not argue in the post-conviction proceeding that trial counsel was ineffective in the numerous ways alleged in these claims. The time for raising the claims in the state courts has passed. *See* Tenn. Code Ann. § 40-30-106(g); Tenn Code Ann. §§ 40-30-102(a), (c) (setting one-year limitations period for post-conviction relief). The claims are thus procedurally defaulted. *See Boerckel*, 526 U.S. at 845.[7]

Vizcaino-Ramos concedes that he defaulted the claims, but argues that the ineffective assistance of his post-conviction counsel in failing to raise them in the state court excuses the defaults. (ECF No. 1 at 10-11.) It does not.

To establish cause to excuse a default at the initial post-conviction stage, Petitioner must show that his post-conviction counsel "was ineffective under the standards of *Strickland*." *Martinez*, 566 U.S. at 14. He must therefore establish that post-conviction counsel performed deficiently and that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the [post-conviction] proceeding would have been different." *Strickland*, 466 U.S. at 694. Vizcaino-Ramos must also establish that the "underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that [he] . . . must demonstrate that the claim has some merit." *Martinez*, 566 U.S. at 14.

Petitioner cannot find relief under *Martinez* because he was not prejudiced by his post-conviction counsel's failure to raise the claims. The post-conviction court heard and considered Vizcaino-Ramos's testimony that the victim verbally and physically abused him, and that she instigated a struggle and an accidental firing of the weapon by grabbing the gun and threatening

---

[7] Even if some of the claims could fairly be regarded as having been subsumed within the primary claim litigated in the initial post-conviction proceeding, they would still be procedurally defaulted for Petitioner's failure to raise them on appeal. The default would not be excused. *See Young*, 702 F. App'x at 259.

"I'm going to help you kill yourself right now." On cross-examination, Petitioner admitted that he was larger than the victim and, when pressed, was unable to explain how the events he described would result in multiple gunshot wounds. (ECF No. 20-10 at 124-125.) The post-conviction court did not credit any of Petitioner's testimony. (ECF No. 20-9 at 69.) It therefore did not believe his story and, more importantly, his representation that he had told trial counsel that story. On the other hand, the court credited trial counsel's testimony (*id.*), which included her statement that Petitioner never told her the version of events he offered at the post-conviction hearing (*id.* at 130). There is, thus, no "reasonable probability," *Strickland*, 466 U.S. at 694, that the post-conviction court would have faulted trial counsel for failing to present and argue forensic evidence purportedly "consistent with" a version of events Petitioner never told her about, or to present, argue, and seek jury instructions on defenses which depend on that uncommunicated version of events.

The claims are also not substantial, as *Martinez* requires. *See Martinez*, 566 U.S. at 14. Trial counsel testified that even if Petitioner had told her about his version of events, she would not have changed her trial strategy. (ECF No. 20-10 at 131.) She explained that the defense still would have faced the same problems: multiple gunshots were fired, Petitioner dragged the victim's body out of the car, he left her son alone in the house, and he fled to Mexico. (*Id.* at 127.) In addition, two witnesses testified that Petitioner threatened to kill the victim in the weeks leading up to the murder. *Vizcaino-Ramos*, 2011 WL 3330294, at *2.

With regard to the wound pattern and autopsy report, they do not show, as Petitioner contends, that the gun was fired during a struggle, but simply that the gun was fired at close range. (ECF No. 20-4 at 49-50, 63-64.) Even if trial counsel could have argued that the forensic evidence was "consistent with" a struggle, she testified that she tailored her cross-examination to

avoid "hav[ing] everything . . . being told to [the jury] over and over about how [the victim] died." (ECF No. 20-10 at 89-90.) Counsel's strategies are presumed to be sound, and Petitioner has not "overcome the presumption." *Strickland*, 466 U.S. at 689.[8]

For all of these reasons, Claims 2, 4, 6, 8, 10(c), 10(d), and 16(c) are not reviewable in this federal habeas proceeding because they are procedurally defaulted. The claims are therefore **DISMISSED**.

### 4. Claim 10(a), Claim 10(b), and Claim 16(b)

Petitioner alleges that, at the time of the shooting, his mental capacity was diminished due to chronic alcoholism and severe depression. (ECF No. 1 at 39.) He also alleges that he was "profoundly intoxicated" when he shot the victim. (*Id*. at 42.) He contends that, in light of these alleged facts, trial counsel was ineffective in failing to introduce evidence of, and seek jury instructions on, diminished capacity due to chronic alcoholism and severe depression (Claim 10(a)) and voluntary intoxication (Claim 10(b)).[9] Relatedly, he challenges counsel's failure to argue those defenses at closing (Claim 16(b)).

---

[8] Although Petitioner originally asserted that there were multiple disputed facts that made a determination on substantiality under *Martinez* impossible without a hearing (ECF No. 22), he thereafter narrowed the field of purported factual disputes to just the circumstances surrounding the no-contact order, as they relate to Claim 8(a). (ECF No. 31 at 1-2.) As noted, the Court denied an evidentiary hearing on Claim 8(a). (ECF No. 32.)

[9] In Tennessee, the defenses of diminished capacity and voluntary intoxication are proffered to negate the element of "intent." *State v. Halliburton*, No. W2015-02157-CCA-R3-CD, 2016 WL 7102747, at *13 (Tenn. Crim. App. Dec. 6, 2016) ("'[D]iminished capacity is . . . an attempt to prove that the defendant [was] incapable of [forming] the requisite intent of the crime charged'") (quoting *State v. Hall*, 958 S.W.2d 679, 688 (Tenn. 1997)); *State v. Reed*, No. M2012-02542-CCA-R3CD, 2013 WL 6123155, at *22 (Tenn. Crim. App. Nov. 20, 2013) ("[T]he [voluntary] intoxication of a defendant . . . may negate a finding of specific intent.") (citing *State v. Bullington*, 532 S.W.2d 556, 560 (Tenn.1976) and Tenn.Code Ann. § 39–11–503(a)).

The claims are procedurally defaulted. Vizcaino-Ramos did not present these claims in his initial post-conviction proceeding, and the time for doing so has passed.[10] He acknowledges that the claims are procedurally defaulted, but argues that the ineffective assistance of his post-conviction counsel is cause under *Martinez* to excuse the defaults. (ECF No. 1 at 11, 12.) His argument is without merit because the claims are not substantial.

Petitioner provides no support for his factual assertion that he suffered from severe depression and chronic alcoholism which prevented him from forming the requisite mental state of premeditation. He also does not allege that he told trial counsel about such conditions, or that she knew of facts or circumstances that would have led her to believe that he might have suffered from those conditions at the time of the shooting.

Similarly, he does not identify the intoxicating substance and how much of it he consumed. He also does not suggest that he told trial counsel that he had been intoxicated, or that she knew of facts or circumstances that would have led her to believe that he might have been intoxicated. *Cf. Trotter v. Dotson*, No. 4:07-CV-38, 2010 WL 3656046, at *9 (E.D. Tenn. Sept. 14, 2010) (holding state court's determination that counsel was not ineffective for failing to move to suppress petitioner's statement was not unreasonable where petitioner "admitted that he did not tell his trial attorney that he was under the influence of drugs or alcohol at the time he gave his statement to the police.")

Accordingly, Petitioner has not established cause to excuse the procedural defaults of Claims 10(a), 10(b), and 16(b). The claims are therefore **DISMISSED**.

---

[10] To the extent that Petitioner means that his trial attorney should have secured an expert mental evaluation, he exhausted that issue before the TCCA in his appeal from denial of post-conviction relief. (ECF No. 20-11 at 12.) The Court reviews the TCCA's affirmance in its discussion of Claim 12, *infra*.

### 5. Claim 12

In Claim 12, Petitioner asserts that trial counsel rendered ineffective assistance by failing to seek an expert mental evaluation. (ECF No. 1 at 12.) The claim was raised and litigated in both the post-conviction hearing and on appeal. *See Vizcaino-Ramos*, 2013 WL 6212041, at *1, 7. Because Petitioner properly exhausted the claim in the state courts, it is reviewable by this Court under the AEDPA's deferential standards. *See* 28 U.S.C. § 2254(b)(1)(A).

On review of the record adduced at the post-conviction hearing, the TCCA affirmed the lower court's determination that trial counsel had not rendered ineffective assistance in failing to seek a mental evaluation of Petitioner. *Id.* at *7. The appellate court explicitly invoked and applied *Strickland*'s standards, *id.* at *6, and held that Petitioner had not established that he was prejudiced by his trial counsel's conduct. *Id.* at *7. The TCCA found that there was no evidence in the post-conviction record as to "what the results of a mental evaluation would have been." *Id.* In the absence of such evidence, the TCCA could not "conclude that a mental evaluation would have, with a reasonable probability, changed the results of petitioner's trial." *Id.*[11]

Petitioner has not shown that he is entitled to relief under the AEDPA on Claim 12. First, the TCCA's ineffective-assistance determination is not "contrary to" clearly established Supreme Court law, 28 U.S.C. § 2254(d)(1), because the court applied *Strickland*'s standards to the facts before it. A "state-court decision applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case [does] not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

---

[11] In his motion for an evidentiary hearing, Petitioner insisted that he is entitled to an evidentiary hearing on Claim 12. (ECF No. 22.) The Court denied the motion on the authority of *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). (ECF No. 32 at 10-11.)

Second, the state appellate court's holding is not based on an unreasonable determination of the facts or an unreasonable application of *Strickland*'s standards to the facts. *See* 28 U.S.C. § 2254(d)(1), (d)(2). The TCCA reviewed the record and found that it was devoid of evidence demonstrating "what the results of a mental evaluation would have been." *Vizcaino-Ramos*, 2013 WL 6212041, at *7. Petitioner has not pointed to any clear and convincing contrary evidence that would undermine that finding. The TCCA was therefore faced with a record which did not evince a "reasonable probability" *Strickland*, 466 U.S. at 697, that the outcome of Petitioner's trial would have been different had counsel secured a mental evaluation. The TCCA's determination that counsel did not render ineffective assistance is therefore not objectively unreasonable. *See e.g. Harris v. Carlton*, No. 2:05-CV-24, 2007 WL 776517, at *9 (E.D. Tenn. Mar. 9, 2007) (holding that "the state court did not unreasonably apply *Strickland* when it refused to grant petitioner relief . . . based on its conclusion that he had offered no proof of prejudice").

Because the TCCA's ineffective assistance determination is not contrary to clearly established Supreme Court law, based on an unreasonable determination of the facts, or the result of an unreasonable application of clearly established law to the facts, Claim 12 is **DENIED** as lacking merit.

### 6. Claim 14

In Claim 14, Petitioner asserts that trial counsel was ineffective in failing to object to the admissibility of evidence that he stole the victim's car and personal effects, and fled to Mexico. (ECF No. 1 at 12, 65.) Petitioner does not deny that he did not exhaust the claim in the state courts and that the time for doing so has passed. He argues, however, that *Martinez* applies to excuse the procedural default. (ECF No. 1 at 12; ECF No. 27 at 4.) Respondent contends that

Petitioner cannot show cause under *Martinez* because the claim is not substantial. (ECF No. 21 at 26.) The Court agrees.

In Tennessee, "'flight and attempts to evade arrest are circumstances from which, when considered with other facts and circumstances in evidence, a jury can properly draw an inference of guilt." *State v. Dorantes*, 331 S.W.3d 370, 388 (Tenn. 2011) (quoting *State v. Zagorski*, 701 S.W.2d 808, 813 (Tenn. 1985)). The evidence of Vizcaino-Ramos's flight from the crime scene and relocation to Mexico was therefore admissible under Tennessee law. Trial counsel thus did not perform deficiently by failing to make a futile objection to the admissibility of the evidence. *See e.g. Daniels v. Romanowski*, No. 07-CV-10462, 2009 WL 236543, at *7 (E.D. Mich. Jan. 29, 2009) ("Because the flight-related evidence was admissible, Petitioner cannot establish that counsel was ineffective for not objecting to its admission. Defense counsel cannot be deemed deficient for failing to make a futile objection or motion.")[12]

Accordingly, Claim 14 is **DISMISSED** as procedurally defaulted.

### 7. Claims 16(a) and (d)

In Claim 16, Petitioner alleges that trial counsel "made egregious and erroneous statements to the jury during both opening and closing arguments." (ECF No. 1 at 12.) He asserts that counsel rendered ineffective assistance by not explaining in her opening statement why the State could not prove the element of premeditation (Claim 16(a)), and by making an "inept and strategically senseless" statement during closing argument (Claim 16(d)). (*Id.* at 68-72.) The Court finds that the claims must be dismissed.

---

[12] As the post-conviction testimony shows (ECF No. 20-10 at 30, 92), the flight evidence was also "relevant to explain the lapse of time between the incident and the petitioner's arrest and his criminal proceedings." *Harris v. Warren*, No. CIV. 06-14074, 2009 WL 1099236, at *8 (E.D. Mich. Apr. 23, 2009).

**A. Failure to Address the Element of Premeditation in Opening Statement**

The claim that counsel was ineffective in failing to explain in her opening statement why the State could not prove premeditation is procedurally defaulted. Although Petitioner did not raise the claim in his amended post-conviction petition, the parties addressed the issue through the post-conviction testimony. (ECF No. 20-10 at 81-82.) The issue, however, was not raised on appeal from denial of post-conviction relief. (ECF No. 20-11 at 12.) Petitioner acknowledges that the claim is defaulted, but argues that the default is excused under *Martinez*. (ECF No. 1 at 12.)

Petitioner cannot show that *Martinez* applies. If the claim is regarded as having been procedurally defaulted at the appellate level, the default is not excused because "postconviction appellate counsel's ineffective assistance cannot serve as cause to excuse a procedural default." *Young*, 702 F. App'x at 259. If the claim is deemed to have been defaulted by post-conviction counsel's failure to squarely raise it at the initial post-conviction level, the default is still unexcused, but for the reason that the claim is not substantial, as *Martinez* requires.

Under *Strickland*, Petitioner has the burden to "overcome the presumption that . . . the challenged action might be considered sound trial strategy." 466 U.S. at 689. At the post-conviction hearing, trial counsel testified that, instead of using her opening statement to explain why the prosecution could not prove the element of premeditation, she intended to use trial strategy to negate the essential elements of the crime. (ECF No. 20-10 at 82.) Petitioner does not explain how the decision to wait until after all the proof had concluded to argue that the elements of first-degree murder had not been proven was an unreasonable strategy. *See e.g.*, *Griffith v. Taylor*, No. 2:13-CV-169, 2016 WL 5819369, at *5 (E.D. Tenn. Oct. 5, 2016) (holding ineffective-assistance claim was not substantial for purposes of *Martinez* where

"[c]ounsel's opening statements appear[] to have been reasonable trial strategy and not a result of ineffectiveness . . . .")

Claim 16(a) is therefore procedurally defaulted and the default is unexcused.

**B. "Inept" and "Senseless" Statement at Closing**

Petitioner claims that counsel rendered ineffective assistance by stating during closing argument that "Something happened when [the victim] and [the defendant] and [the victim's son] left that house that changed the events of that night. I don't know what it was. We didn't hear what it was." (ECF No. 20-3 at 63.) Petitioner did not challenge that statement at the initial post-conviction proceeding. He does not deny that the claim is procedurally defaulted, but insists that the ineffectiveness of post-conviction counsel in failing to raise it excuses the default. (ECF No. 1 at 12.) Respondent argues that *Martinez* does not apply to excuse the default because the claim is not substantial. (ECF No. 21 at 15, 27-28.)

In assessing whether counsel rendered ineffective assistance, the Court must view the statement at closing argument "in the context of [her] entire argument." *Pike v. Freeman*, No. 1:12-CV-35, 2016 WL 1050717, at *19–20 (E.D. Tenn. Mar. 11, 2016) (citing *Moore v. Mitchell*, 708 F.3d 760, 790 (6th Cir. 2013)). Prior to defense counsel's closing argument, the prosecutor argued the following:

> . . . Ms. Reba Thurman testified this morning and pretty much all she testified about was the fact that [she and Mr. Alberto Vasquez] came over to the house and that [they] were going to pick [the defendant] up. I'm not the smartest guy in the world and I'm honest enough to admit that but I'm thinking how does that really apply and why did we hear from this witness [?] . . . Who else lived in that house besides [the victim] and the defendant? A five year old child that was left there by himself, and he had his friends going and they could pick up the child.
> Did [the defendant] tell them that was the purpose? Of course not. But did that make sense? If he knew he was going to kill [the victim], what was he going to do with that child? He had his friends going to pick him up. That makes perfect sense. Not lack of premeditation; even better planning toward it.

(ECF No. 20-3 at 52-53.)

At the beginning of her closing argument, defense counsel addressed Reba's testimony that the defendant had asked her and Alberto to come to the house, rebutting the prosecution's suggestion that the invitation evidenced premeditation:

> I don't know why [the defendant] told Alberto and Reba to come over there. They told us he told them to come over there to pick him up. That's the evidence you heard. There's nothing in this record that they were to come over there and pick up [the child] because [the defendant] murdered her by that point. That's not in the record . . . . I would submit to you what I would think about that is, I believe Alberto stated that [the defendant] wanted to talk to [the victim] and then he wanted them to pick him up because he was spending the nights at their house. I believe that was the testimony.

(ECF No. 20-3 at 62-63.)

Counsel then suggested to the jury that the defendant's plan to sleep at Alberto and Reba's house was interrupted:

> Something happened when [the victim] and [the defendant] and [the victim's son] left that house that changed the events of that night. I don't know what it was. We didn't hear what it was. . . .

(*Id.* at 63.)

Counsel then proceeded to argue additional evidence she considered to be probative of lack of premeditation, including the fact that the child was in the car at the time of the shooting ("The reason somebody might" shoot someone in front of a child "is because they haven't made a plan, they haven't thought things through . . ."), and that the gun was left in the yard. (*Id.* at 65.)

Counsel's statement that she did not know what happened after the victim, her son, and the defendant left the house that night was clearly part of a narrative meant to negate the element of premeditation—a defense strategy that the post-conviction court found to be reasonable. (ECF No. 20-10 at 69.) Petitioner's claim that counsel's statement constituted ineffective

assistance is therefore not substantial for purposes of *Martinez*. *See e.g.*, *Pike*, 2016 WL 1050717, at *19–20 ("Based on the review of counsel's entire opening statement, as well as co-counsel's closing argument, the Court cannot find that each statement was not a part of the constitutionally protected strategy that counsel chose to adopt.")

Because Claims 16(a) and (d) are procedurally defaulted, they are **DISMISSED**.

For all of these reasons, the Petition is **DENIED**. Judgment shall be **ENTERED** for Respondent.

## APPEAL ISSUES

A § 2254 petitioner may not proceed on appeal unless a district or circuit judge issues a certificate of appealability ("COA"). 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA may issue only if the petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2)-(3). A "substantial showing" is made when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell,* 537 U.S. 322, 336 (quoting *Slack v. Daniel*, 529 U.S. 473, 484 (2000)). "If the petition was denied on procedural grounds, the petitioner must show, 'at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.'" *Dufresne v. Palmer*, 876 F.3d 248, 252-53 (6th Cir. 2017) (quoting *Slack*, 529 U.S. at 484).

In this case, reasonable jurists would not debate the correctness of the Court's decision to deny the Petition. Because any appeal by Petitioner does not deserve attention, the Court **DENIES** a certificate of appealability.

Pursuant to Federal Rule of Appellate Procedure 24(a), a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit. Fed. R. App. P. 24(a). However, Rule 24(a) also provides that if the district court certifies that an appeal would not be taken in good faith, the prisoner must file his motion to proceed *in forma pauperis* in the appellate court. *Id.*

In this case, for the same reasons it denies a COA, the Court **CERTIFIE**S, pursuant to Rule 24(a), that any appeal in this matter would not be taken in good faith. Leave to appeal *in forma pauperis* is therefore **DENIED**.

        **IT IS SO ORDERED**.

                                        **s/ S. Thomas Anderson**
                                        S. THOMAS ANDERSON
                                        CHIEF UNITED STATES DISTRICT JUDGE

                                        Date: January 10, 2018.